IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

MATTHEW REEVES,                          )
                                         )
                Plaintiff,               )
                                         )
v.                                       )        CASE NO.  2:20-cv-027-RAH
                                         )                  [WO]
JEFFERSON S. DUNN, *et al.*,              )
                                         )
                Defendants.              )

## MEMORANDUM OPINION AND ORDER

## I.      INTRODUCTION

Plaintiff Matthew Reeves is an Alabama death row inmate in the custody of

the Alabama Department of Corrections (ADOC) at Holman Correctional Facility.[1]

On January 10, 2020, Reeves filed this lawsuit under 42 U.S.C. § 1983 and the

Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.* (ADA) against

Defendants Jefferson Dunn, the Commissioner of the ADOC, and Terry Raybon, the

Warden at Holman (collectively, the ADOC).  Both defendants are sued in their

official capacities.

---

[1]  Holman is the primary correctional facility for housing death row inmates in Alabama and is the only facility in the
state that performs executions.

In his Amended Complaint (Doc. 21), Reeves alleges the ADOC violated his rights under the ADA.[2]  He seeks declaratory and injunctive relief.

This matter is before the Court on Reeves's Motion for Preliminary Injunction (Doc. 27), wherein Reeves seeks to enjoin the ADOC from executing him by any method other than nitrogen hypoxia before the conclusion of this litigation.  The motion has been fully briefed (Docs. 42, 48), and the parties have submitted over two thousand pages of evidence.  On December 9, 2021, the Court conducted an evidentiary hearing, during which it heard over seven hours of testimony and oral argument on the motion.  Following this hearing, the parties submitted supplemental briefing in support of their respective positions. (Docs. 81, 82.)  This matter is ripe for review.

For the following reasons, Reeves's motion for preliminary injunction is due to be granted.

## II.   BACKGROUND

### A.   Reeves's Capital Litigation History

In 1998, Reeves was convicted of murdering Willie Johnson during a robbery in the first degree. By a vote of 10–2, the jury recommended that Reeves be sentenced to death.  The trial court followed the jury's recommendation.

---

[2] Reeves's Amended Complaint also alleged a violation of his constitutional rights under the Eighth Amendment. On November 24, 2021, the Court dismissed this claim. (Doc. 41.)

On appeal, the Alabama Court of Criminal Appeals affirmed Reeves's conviction and sentence. *Reeves v. State*, 807 So. 2d 18 (Ala. Crim. App. 2000).  The Alabama Supreme Court denied Reeves's petition for certiorari review and on June 8, 2001, the appeals court issued a certificate of judgment. *Id*.  Reeves's direct appeal concluded on November 13, 2001, when the United States Supreme Court denied his petition for a writ of certiorari.  *Reeves v. Alabama*, 534 U.S. 1026 (2001).

In October 2002, Reeves filed a petition in the trial court for collateral relief pursuant to Rule 32 of the Alabama Rules of Criminal Procedure.  Reeves raised an *Atkins* claim in this petition.  In *Atkins v. Virginia*, the Supreme Court held that executing a person with an intellectual disability violates the Eighth Amendment. 536 U.S. 304 (2002).  In his petition, Reeves claimed that the *Atkins* decision prohibited his execution because he is intellectually disabled.  In November 2006, the state circuit court held an evidentiary hearing on Reeves's claims.  *See Reeves v. State*, 226 So. 3d 711, 722 (Ala. Crim. App. 2016).  At this hearing, Reeves's medical expert, Dr. John Goff, testified that Reeves suffered from significantly subaverage intellectual functioning, while the State's expert, Dr. Glen King, testified that Reeves falls within the borderline range of intellectual functioning.  The circuit court found that Reeves's intellectual functioning, while subaverage, was not so low that he would meet the first prong of his *Atkins* intellectual disability claim.  It also found that Reeves failed to prove that he suffered from significant deficits in at least

3

two areas of adaptative functioning.   On appeal, the Alabama Court of Criminal Appeals affirmed the circuit court's decision.   *Reeves*, 226 So. 3d at 741.   The Alabama Supreme Court denied Reeves's petition for a writ of certiorari, as did the United States Supreme Court. *Reeves v. Alabama*, 138 S. Ct. 22 (2017) (Sotomayor, J., dissenting).

Reeves then filed a federal habeas corpus petition, pursuant to 28 U.S.C. § 2254, again raising an *Atkins* claim.   Ultimately, the district court denied Reeves's habeas petition, concluding that he was not entitled to relief on any of his claims. The district court did, however, grant Reeves a Certificate of Appealability with respect to the claim that his trial counsel was ineffective for failing to hire an expert to investigate his intellectual disability.  *Reeves v. Dunn*, Case No. 1:17-cv-061-KD-MU, 2019 WL 12469769 (S.D. Ala. Jan. 8, 2019).

In May 2019, Reeves appealed the denial of his habeas petition to the Eleventh Circuit. *See Reeves v. Comm'r Ala. Dep't of Corr.*, No. 19-11779-P (11th Cir. 2019). The Eleventh Circuit affirmed the denial of Reeves's intellectual disability claim, but reversed on the issue of ineffective assistance of counsel at the penalty phase. *Reeves v. Comm'r*, 836 F. App'x 733 (11th Cir. 2020).   The U.S. Supreme Court granted certiorari, reversed the Eleventh Circuit's decision, and remanded the case for further proceedings.  *See Dunn v. Reeves*, 141 S. Ct. 2405 (2021).   Thereafter, the Eleventh Circuit affirmed the district court's denial of habeas relief, concluding

4

Reeves's appeals.  *See Reeves v. Comm'r Ala. Dep't of Corr.*, 855 F. App'x 657 (Mem) (11th Cir. 2021).

**B.    Backdrop of the Present Action**

*1.  Nitrogen Hypoxia Becomes an Alternative Method of Execution*

On June 1, 2018, Alabama Act 2018-353 went into effect. *See* 2018 Ala. Laws Act 2018-353; ALA. CODE § 15-18-82.1(b). This law grants death row inmates a single opportunity to elect that their execution be carried out by a new method called nitrogen hypoxia, in lieu of Alabama's default method, lethal injection. ALA. CODE § 15-18-82.1(b).   The process requires any inmate who wants to elect nitrogen hypoxia to notify his or her warden of that choice in writing within thirty days after a certificate of judgment is issued affirming the inmate's conviction. *Id.*  Inmates, like Reeves, whose certificates of judgment issued prior to June 1, 2018, had from June 1 until June 30, 2018, to elect nitrogen hypoxia in writing.  *Id.* at § 15-18-82.1(b)(2).

Any writing from the inmate is sufficient under the statute.  An inmate's failure to elect nitrogen hypoxia within the thirty-day period operates as a waiver of that method of execution.  Other than requiring that a warden accept written elections from death row inmates during the statutory election period, the statutory language imposes no other duty—or restriction—on the ADOC.  The statute's language does not preclude the ADOC from honoring a late election.  Indeed, in its Answer to

Reeves's Amended Complaint, the ADOC admits that "Commissioner Dunn has the authority to alter, amend, or make exceptions to the protocol and procedures governing the execution of death-sentenced prisoners in the State of Alabama." (Doc. 21 at 2; Doc. 52 at 3.)

### 2. Distribution of the Election Form

On June 26, 2018, the attorneys with the Federal Defenders for the Middle District of Alabama's Capital Habeas Unit traveled to Holman to meet with their clients, notify them of the change in the law, and answer questions regarding nitrogen hypoxia. (Doc. 21 at 4.)   During this meeting, the Federal Defenders provided a typewritten form that their clients could sign and submit to the warden to effectuate a nitrogen hypoxia election. (*Id*.)  This "election form" read as follows:

ELECTION TO BE EXECUTED BY NITROGEN HYPOXIA

Pursuant to Act No. 2018-353, if I am to be executed, I elect that it be by nitrogen hypoxia rather than by lethal injection.

This election is not intended to affect the status of any challenge(s) (current or future) to my conviction(s) or sentence(s), nor waive my right to challenge the constitutionality of any protocol adopted for carrying out execution by nitrogen hypoxia.

Dated this _____ day of June, 2018.

_____          _____
Name/Inmate Number                          Signature

(Doc. 70-5.)  After this meeting, many of the Federal Defenders' clients opted into nitrogen hypoxia.  Some of them did not.

Sometime after this June 26, 2018 meeting, but before the statutory deadline of June 30, 2018, Holman's then-warden, Cynthia Stewart, obtained the Federal Defenders' election form and, at the direction of someone above her at the ADOC, instructed Correctional Captain Jeff Emberton to distribute a copy of the form along with an envelope to every inmate on Holman's death row. (Doc. 27 at 15; Doc. 42 at 33.)  As he handed out the forms, Emberton claims he told inmates that the law had changed and that if they wanted to elect nitrogen hypoxia, they needed to fill out the form, put it in the envelope, and that he would return later to collect any signed forms. (Doc. 21 at 4; Doc. 42-4 at 124, 193–94.)  Numerous inmates used the form to elect nitrogen hypoxia.  A few others elected nitrogen hypoxia by a different writing.  Many inmates, including Reeves, made no election at all.

### 3. No Execution Protocol Developed for Nitrogen Hypoxia

When the Alabama Code was amended to add nitrogen hypoxia as an alternative method of execution, and throughout the June 2018 election period, the ADOC had not yet developed a protocol for performing nitrogen hypoxia executions.  And as of the date of this order, "[a]lthough the ADOC has been working on a hypoxia protocol for more than three years, there is still no working protocol in place . . . ."  (Doc. 23 at 37.)  During oral argument on the pending motion, counsel for the ADOC represented that she expects to "have everything completely ready to go" within "the first three or four months" of 2022. (Doc. 78 at

219.)  Based on this representation, the Court understands that the ADOC expects to be able to perform executions by nitrogen hypoxia by the end of April 2022.

### 4. Reeves's ADA Claim

It is undisputed that Reeves did not elect, or attempt to elect, nitrogen hypoxia during the 30-day statutory opt-in period.  In his Amended Complaint, Reeves claims his "cognitive deficiencies" rendered him unable to "personally make the decision to elect a method of execution" because he could not read and understand the election form provided to him by the ADOC "absent reasonable accommodation." (Doc. 21 at 5.)

Reeves claims that, with IQ scores in the upper 60s and low 70s, his general cognitive limitations and severely limited reading abilities rendered him unable to read and understand the election form without assistance. (*Id.* at 6.)  His inability to understand, Reeves alleges, prevented him from enjoying the benefits of the form and left him unable to elect nitrogen hypoxia before the statutory deadline. (*Id.* at 7–8.)  Because Reeves asserts he could not receive the benefit of the form without a reasonable accommodation, he brings a claim against the ADOC under Title II of the ADA.

Title II bars discrimination by reason of disability from the "benefits of the services, programs, or activities of a public entity." 42 U.S.C. § 12132.  Reeves alleges that in handing out the election form, the ADOC established a public program

or service, the benefits from which he was excluded due to his intellectual disability. (Doc. 21 at 7–8.)  Reeves contends that the ADOC should have provided reasonable accommodations to aid Reeves in understanding the form and its implications. (*Id.* at 11–12.)  He asserts that the ADOC could have, among other things, read the form to him, given him more time to understand it, performed a comprehension check, or used assistive technology. (*Id.* at 7.)

Reeves seeks two kinds of relief.  The first is declaratory:  he asks the Court to declare the ADOC "in violation of the ADA for failing to develop and implement reasonable accommodations concerning the nitrogen hypoxia opt-in and Election Form, for disabled death-sentenced prisoners." (Doc. 21 at 14.)  The second is equitable:  he asks the Court to order the ADOC to implement a reasonable accommodation for the opt-in, and to enjoin the ADOC from executing him "by lethal injection to permit him time to avail himself of the reasonable accommodations developed and implemented as to the nitrogen hypoxia opt-in and the Election Form." (*Id.*)

On September 9, 2021, the ADOC moved to dismiss Reeves's Amended Complaint. (Doc. 23.)   Days later, the Alabama Attorney General moved the Alabama Supreme Court to set Reeves's execution date. (Doc. 25.)  Reeves filed the pending Motion for Preliminary Injunction on November 4, 2021, asking this Court to enjoin the ADOC from executing him by any method other than nitrogen hypoxia

while his ADA claim remains pending. (Doc. 27 at 2.) On November 18, 2021, the

Alabama Supreme Court scheduled Reeves's execution for January 27, 2022. (Doc.

37 at 3–4.)  The Court turns now to Reeves's Motion for Preliminary Injunction.

## III.  JURISDICTION AND VENUE

The Court has original subject matter jurisdiction of this case pursuant to 28

U.S.C. §§ 1331, 1343(a)(3), 2201, and 42 U.S.C. § 12133.

Personal jurisdiction and venue are uncontested, and the Court concludes that

venue properly lies in the Middle District of Alabama. *See* 28 U.S.C. § 1391.

## IV.  DISCUSSION

### A. Standing

As an initial matter, the Court will address the ADOC's argument that Reeves

lacks Article III standing to bring his ADA claim. (Doc. 42 at 5.)  In its opposition

to Reeves's Motion for Preliminary Injunction, the ADOC asserts that Reeves has

not established an injury-in-fact, fails to show that any alleged injury was caused by

the ADOC, and that this Court lacks the authority to redress Reeves's claimed injury.

(*Id.* at 5–17.)

In his reply to the ADOC's opposition, Reeves appears perplexed by the

ADOC's contention that he lacks standing given that the Eleventh Circuit held

otherwise in a similar case several months ago.  Reeves and the ADOC agree, as

does this Court, that the standing issues in this lawsuit are nearly identical to those

in the Willie B. Smith III litigation, wherein Smith advanced the same ADA claims regarding the ADOC's distribution of the election form. *See Smith v. Dunn*, Case No. 19-CV-00927-ECM (M.D. Ala. 2021). Yet, the ADOC asks this Court to adopt the factual findings of the district court in the *Smith* litigation, and in turn, ignore the holding made by the Eleventh Circuit on appeal.

In *Smith*, the district court sua sponte dismissed Smith's ADA lawsuit after finding he lacked Article III standing to bring his claim. *Id.* On appeal, the Eleventh Circuit unanimously vacated the district court's decision, holding that Smith had sufficiently alleged an injury, established causation, and that his injury was redressable by an order from the district court. *Smith v. Comm'r, Ala. Dep't of Corr.*, Case No. 21-13298, 2021 WL 4817748 (11th Cir. 2021). The ADOC chose not to seek a rehearing or appeal to the United States Supreme Court.

The ADOC urges this Court to disregard the Eleventh Circuit's holding in *Smith* because the unpublished opinion is not binding (Doc. 42 at 17), it offers "little . . . persuasive value" (Doc. 81 at 7), and was issued following an "extremely compressed time schedule" (Doc. 42 at 17–18). Regardless, the Eleventh Circuit's *Smith* decision is, at a minimum, persuasive to this Court and is factually indistinguishable. The Court sees no reason to depart from that holding. Reeves, like Smith, has alleged an injury, established causation, and his alleged injury is

redressable by an order from this Court.[3]   Now on to the matter of a preliminary injunction.

## B. Preliminary Injunction

The purpose of a preliminary injunction is to "preserve the relative positions of the parties until a trial on the merits can be held." *United States v. Lambert*, 695 F.2d 536, 539 (11th Cir. 1983).  A preliminary injunction "is meant to keep the status quo for a merits decision, not replace it."  *Brown v. Sec'y, U.S. Dep't of Health & Human Servs.,* 4 F.4th 1220, 1225 (11th Cir. 2021).

Reeves is entitled to a preliminary injunction if he demonstrates that: (1) he has a substantial likelihood of success on the merits; (2) he will suffer irreparable injury unless the injunction issues; (3) the threatened injury outweighs the harm the injunction would cause the other litigant; and (4) if issued, the injunction would not be adverse to the public interest. *Chavez v. Fla. SP Warden*, 742 F.3d 1267, 1271 (11th Cir. 2014).  However, "when the [State] is the party opposing the preliminary injunction, its interest and harm merge with the public interest," and so the third and fourth elements are the same. *Swain v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020) (citing *Nken v. Holder* 556 U.S. 418, 435 (2009)).

---

[3] As in *Smith*, Reeves's alleged injury is his being excluded from the benefit of electing what he believes is a less painful method of execution. (Doc. 21 at 7-8.)  And like Smith, Reeves has alleged that his injury is the result of the ADOC developing and implementing a program without providing an accommodation for Reeves's cognitive disability. (*Id.* at 7.) As to redressability, the Eleventh Circuit held in *Smith* that the ability of this Court to "fashion effective relief for a violation of federal law is not limited by what state law permits." *Smith,* 2021 WL 4817748 at *4.

A preliminary injunction is an "extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion for each prong of the analysis." *America's Health Ins. Plans v. Hudgens*, 742 F.3d 1319, 1329 (11th Cir. 2014) (quotations and citation omitted).  Reeves, as the movant, must satisfy his burden on all requirements "by a clear showing." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam).

For the following reasons, Reeves has successfully demonstrated he is entitled to a preliminary injunction.

*1. Substantial Likelihood of Success on the Merits*

Reeves alleges that the ADOC violated Title II of the ADA by failing to reasonably accommodate his disability in the distribution and use of the election form.  As a result, Reeves argues that he was unable to utilize the form to exercise his statutory right to elect nitrogen hypoxia as his preferred method of execution.

Title II of the ADA bars discrimination by reason of disability from the "benefits of the services, programs, or activities of a public entity." 42 U.S.C. § 12132.  Title II supports claims under three theories of discrimination:  intentional discrimination, disparate treatment, or a failure to make reasonable accommodations. *See Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1212 n.6 (11th Cir. 2008); *see also Friedson v. Shoar*, 479 F. Supp. 3d 1255, 1263 n.6 (M.D. Fla. 2020) (citing the same).  To succeed on a Title II claim under a failure to

reasonably accommodate theory, a plaintiff must demonstrate that (1) he is a qualified individual with a disability; (2) he lacked meaningful access to the benefits of a public entity's services, programs, or activities by reason of his disability; and (3) the public entity failed to provide a reasonable accommodation for his disability. *Todd v. Carstarphen*, 236 F. Supp. 3d 1311, 1327–28 (N.D. Ga. 2017) (citing *Nadler v. Harvey*, 2007 WL 2404705, at *5 (11th Cir. 2007)); *Redding v. Nova Se. Univ., Inc.*, 165 F. Supp. 3d 1274, 1299 (S.D. Fla. 2016) (stating that the ADA "requires only those accommodations that are necessary to ameliorate a disability's effect of preventing meaningful access to the benefits of, or participation in, the program at issue.").

Reeves argues that he has satisfied his burden and shown by clear evidence that he is substantially likely to succeed on all three elements. The ADOC disputes Reeves's ability to prove any of these elements. The Court addresses each element in turn.

a. Qualified Individual with a Disability

To sustain an ADA claim, Reeves must demonstrate that he is a (1) qualified individual with (2) a disability cognizable under the statute. There is a substantial likelihood that he is both.

The ADA defines "disability" as a "physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A).

Such activities include "speaking, breathing, learning, reading, concentrating, thinking, communication, and working." *Id.* at § 12102(2)(A). The term "disability" is to be construed broadly. *Id.* at § 12102(4)(A).

Although the ADOC contests that Reeves suffers from a disability, the record contains evidence that he is indeed disabled under the broad construction of the ADA. Previous neurological testing found Reeves's IQ to be between 68 and 71. (Doc. 44-3 at 1; Doc. 44-4 at 1.) Because he raised an *Atkins* claim in both his state post-conviction and federal habeas litigation, Reeves was independently assessed by a neuropsychologist retained by his own counsel as well as one retained by the State of Alabama.

In 2006, when Reeves was 28 years old, Dr. John Goff administered numerous tests, including, among others, the Wechsler Adult Intelligence Scale and the Speech Sounds Perception Test. (Doc. 27 at 9.) Dr. Goff determined that Reeves had an IQ of 71, was "essentially illiterate," and that it was "quite apparent" Reeves had never adequately learned to read or write. (Doc. 27-28.) Dr. Goff ranked Reeves in the 5th percentile for vocabulary, the 1st percentile for letter sequencing, and the 0.4th percentile for comprehension. (*Id.*) The State's expert, Dr. Glenn King, performed similar testing and determined that Reeves had a full-scale IQ score of 68, could read

and spell at a 5th grade level, and had borderline intellectual functioning, but opined that he did not believe Reeves was "mentally retarded."[4] (Doc. 27-5 at 10.)

More recently, in support of his ADA claim, Reeves retained Dr. Kathleen Fahey, a speech pathologist who conducted a three-hour, in-person evaluation of Reeves on December 1, 2021.  Dr. Fahey likewise evaluated the election form itself, running its text through software programs designed to calculate the readability of the language used in the form.   Dr. Fahey testified at the December 9, 2021 evidentiary hearing as to her findings and opinions.

Following her evaluation of Reeves, Dr. Fahey determined that Reeves has "a significant and severe language disorder." (Doc. 78 at 38.)   She testified that Reeves's language competency was that of someone between the ages of 4 and 10. (*Id.* at 39.)  She also determined that his reading accuracy was at the 4th grade level and his reading comprehension was at the 1st grade level. (*Id.*)  The election form, on the other hand, required an 11th grade reading level to be understood. (*Id.* at 33–34.)  All told, Dr. Fahey testified that in her professional opinion, Reeves's language disorder rendered him unable to comprehend the election form. (*Id.* at 39.)

---

[4] As the Supreme Court noted in *Hall v. Florida*, both law and medicine have now moved away from the terms 'mentally retarded' and 'mental retardation.'" *Kilgore v. Sec'y, Fla. Dep't of Corr.*, 805 F.3d 1301, 1303 n.1 (11th Cir. 2015) (citing *Hall v. Florida*, 572 U.S. 701, 704–05 (2014)).

For its part, the ADOC presented no evidence to contradict the opinions of Dr. Fahey.[5]  In its supplemental brief on the pending motion, the ADOC calls Dr. Fahey's conclusions "incredible," pointing out that her opinion of Reeves remained unchanged even after hearing a recording of Reeves reading aloud to his mother a letter that was scored at a 5th grade reading level. (Doc. 81 at 20–22.)  But the ADOC did not retain its own expert to rebut Dr. Fahey's conclusions, or offer expert testimony of any sort, and does not contest the findings of Dr. Goff or Dr. King.[6]  Instead, the ADOC repeatedly points out that, despite the opinions of these doctors, no court has ever found Reeves to be intellectually disabled under the standard set out in *Atkins v. Virginia*.  This argument, however, improperly conflates Alabama's *Atkins* standard[7] with that of the ADA's rather broad, and much lower, standard.

The bar to be considered "disabled" under the ADA is not a high one. *See, e.g.*, *Mazzeo v. Color Resolutions Int'l, LLC*, 746 F.3d 1264, 1268 & n.2 (11th Cir.

---

[5] During her cross examination of Dr. Fahey, counsel for the ADOC attempted to dispute Dr. Fahey's findings as to the readability of the election form.  Counsel indicated that she had performed her own evaluation using the same software programs and the results showed the form read at a 10th grade level, rather than 11th grade as Dr. Fahey found. (Doc. 78 at 51-52.)  This assertion within a question presented by counsel is not evidence.

[6] The ADOC cites to numerous medical request forms it claims were filled out by Reeves as evidence that he is not disabled. Because these records have not been interpreted by an expert or given context as to the circumstances in which they were completed, they are more appropriately weighed as evidence regarding whether or not Reeves's disability was obvious to the ADOC rather than evidence that he was not, in fact, disabled.

[7] "[T]o be intellectually disabled under *Atkins*, a defendant must prove by a preponderance of the evidence: (1) 'significantly subaverage intellectual functioning (an IQ of 70 or below),' (2) 'significant or substantial deficits in adaptive behavior,' and (3) that both the subaverage intellectual functioning and the deficits in adaptive functioning manifested before the age of eighteen." *Smith v. Comm'r, Ala. Dep't of Corr.*, 924 F.3d 1330, 1340 (11th Cir. 2019) (quoting *Ex Parte Perkins*, 851 So. 2d 453, 456 (Ala. 2002)).

2014) (explaining that Congress instructed that "the establishment of coverage under the ADA should not be overly complex nor difficult" (quoting H.R. Rep. No. 110-730, at 9 (2008))).  Given the broad construction the ADA demands, Reeves is likely to win on this point.  Though he may not have been found to be so severely impaired to qualify for relief under *Atkins*, the ADA's disability standard is much lower.  The evidence presented at this stage demonstrates that Reeves's cognitive impairments and low intellectual functioning affect several major life activities, such as reading, writing, and comprehension, placing Reeves under the ambit of the ADA.

Although he is likely to succeed in demonstrating his disability, Reeves must also demonstrate that he is a qualified individual under the ADA.  A "qualified individual," as defined by the ADA, is one who "with or without reasonable modifications to rules, policies or practices, . . . or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).  To be a qualified individual, Reeves must demonstrate that the prison was offering a program, service, or activity in which he was eligible to participate.[8]

The parties disagree on whether a program, service, or activity was offered here.  Reeves maintains that then-Warden Stewart established a "policy, protocol,

---

[8]  Prisons are "public entities," which the statute defines as "any department, agency, . . . or other instrumentality of a State . . . or local government." 42 U.S.C. § 12131(1)(B); *see also Yeskey*, 524 U.S. 206 (holding that state prisons are "public entit[ies]" under Title II of the ADA).

and program whereby corrections staff were instructed to distribute the Election Forms . . . to all death row prisoners." (Doc. 21 at 4).  The ADOC disagrees that its distribution of the election form constituted a public benefit or service under the ADA, noting that although then-Warden Stewart directed that the forms be handed out, she "does not recall who told her to pass out the forms, when that instruction was given, or the circumstances of that conversation." (Doc. 42 at 33.)  In briefing and during oral argument, counsel for the ADOC argued that use of the election form was not required to effectuate a nitrogen hypoxia election under the statute and that the form's distribution was not "a formalized process" (Doc. 78 at 207), but rather was merely a "courtesy at the end of the election period" (Doc. 42 at 31).

The ADOC's framing of what constitutes a program, service, or activity under the ADA is far too narrow.  As courts across the country have long emphasized, "[t]he ADA, as a remedial statute, must be broadly construed to effectuate its purpose." *Soto v. City of Newark*, 72 F. Supp. 2d 489, 493 (D.N.J. 1999) (citations omitted); *see also Niece v. Fitzner*, 922 F. Supp. 1208, 1217 (E.D. Mich. 1996) (explaining that, "to give effect to the ADA's purpose of eliminating discrimination . . . most courts have given a broad reading to the term 'service.'" (citations omitted)).  Activities as diverse as planning municipal weddings,[9]

---

[9] *Soto*, 72 F. Supp. 2d at 494.

facilitating prisoner access to phone calls,[10] or holding county quorum meetings[11] have all been found to constitute "services" under the ADA.

Department of Justice regulations, promulgated pursuant to the ADA, are similarly expansive.[12] The Department instructs that Title II and its own regulations apply "to all services, programs, and activities provided or made available by public entities." 28 C.F.R. § 35.102(a).  At least one court interpreted this "broad language [as] intended to 'appl[y] to *anything a public entity* does.'" *Yeskey v. Penn. Dep't of Corrs.*, 118 F.3d 168, 171 (3d Cir. 1997) (second alteration in original) (emphasis added) (quotation and citations omitted).

The record here makes clear the non-trivial nature of the ADOC's decision to distribute the election form.  Captain Emberton took over one hundred copies of this form, with over one hundred envelopes, and gave every inmate on death row one of each. (Doc. 42-4 at 128-131.)  Emberton says he made an "announcement on each tier" of the area where death row inmates are housed that the law had changed and that they now had a new choice of execution method. (Doc. 78 at 194.)  He was directed to do this by Holman's then-warden, who herself was directed by someone above her in the ADOC's chain of command, reasoning that the form's distribution

---

[10]  *Niece*, 922 F. Supp. at 1218–19.

[11]  *Layton v. Elder*, 143 F.3d 469, 472–73 (8th Cir. 1998).

[12]  Title II of the ADA directs the Attorney General to "promulgate regulations in an accessible format that implement [that Title]." 42 U.S.C. § 12134.

was in the "best interest" of the inmates. (Doc. 42-4 at 176.)  Whether formal or informal, or merely a courtesy, the record at this stage sufficiently establishes that the ADOC's distribution of the election form was just the sort of "service," "program," or "activity" the ADA, in its broad sweep, was intended to include.

Treating the form's distribution as a "service," Reeves must still demonstrate that he was eligible to receive that service. *See* 42 U.S.C. § 12131(2) (defining a qualified individual as one who "meets the essential eligibility requirements for the receipt of services").  Reeves argues that he meets the eligibility requirements because the election form "was provided to all death row inmates," and he is a death row inmate. (Doc. 27 at 14.)

The record confirms Reeves's contention.  Captain Emberton handed out a form to every inmate on death row.  Nothing in the record indicates that Emberton attempted to discern whether a particular inmate wanted to opt into nitrogen hypoxia before handing him a form.  His only criterion, and thus the only apparent eligibility requirement for this service, was whether an inmate was on death row at Holman at the time of the form's distribution.  Reeves, a death row inmate in June 2018, was clearly eligible to receive an election form and participate in the benefits tied to the form and its distribution.  Reeves is likely to succeed in showing that he is a qualified individual with a disability under the ADA.

b. Lack of Meaningful Access Due to Disability

Though the Court agrees that Reeves can likely show he is a qualified individual with a disability under the ADA, he must still demonstrate that he lacked meaningful access to the benefits of the service for which he was eligible. *Alexander v. Choate*, 469 U.S. 287, 301 (1985) ("[A]n otherwise qualified handicapped individual must be provided with meaningful access to the benefit that the grantee offers."); *see also Mason v. Corr. Med. Servs., Inc.*, 559 F.3d 880, 888 (8th Cir. 2009) (explaining that to bring a valid Title II claim, a plaintiff "must specify a benefit to which he was denied meaningful access based on his disability").

"However, mere difficulty in accessing a benefit is not, by itself, a violation of the ADA." *People First of Ala. v. Merrill*, 467 F. Supp. 3d 1179, 1216 (N.D. Ala. 2020) (citing *Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1088 (11th Cir. 2007)). Indeed, "equal access is not the standard under the law." *Medina v. City of Cape Coral*, 72 F. Supp. 3d 1274, 1280 (M.D. Fla. 2014); *see also A.M. ex rel. J.M. v. NYC Dep't of Educ.*, 840 F. Supp. 2d 660, 680 (E.D.N.Y. 2012) ("'Meaningful access' . . . does not mean 'equal access' or preferential treatment.").

Here, Reeves must identify a specific benefit the form provided, and then demonstrate that he lacked meaningful access to that benefit. *Mason*, 559 F.3d at 888. Reeves is substantially likely to satisfy both requirements.

First, Reeves can likely demonstrate that the election form provided specific benefits.  Reeves argues that those benefits include (1) notice of the new method of execution to the inmates (Doc. 21 at 4), (2) ease and ability of electing the new method of execution, (3) "avoiding a substantially painful execution via lethal injection" (Doc. 27 at 16), and (4) reservation of an inmate's right to "challenge the constitutionality of any [execution] protocol" (Doc. 27 at 15–16).

While there is general agreement between the parties that the form at least made a nitrogen hypoxia election easier, the ADOC argues that the form itself provided no benefit to Reeves because the benefits of notice and choosing one's method of execution were provided by the state statute, not by the form.  Reeves's statutory right to elect nitrogen hypoxia vested on June 1, 2018, the day ALA. CODE § 15-18-82.1 became effective.  That right continued, unimpeded, until the statutory period expired.  During that time, the ADOC asserts, Reeves had the ability to elect nitrogen hypoxia by submitting any writing he wished. (Doc. 42 at 31.)

True enough, the form was not required to effectuate an election.  But also true is that the statute did not require the ADOC to distribute the election form.  After Alabama law was amended to add nitrogen hypoxia as a method of execution, had the ADOC simply done nothing, it would have had no duty or obligation to inform inmates of the law or facilitate their ability to elect a new method of execution.  But when the ADOC voluntarily made the decision to distribute a form which not only

made electing nitrogen hypoxia easier, but also included notice about the change in the law and reservation of rights language beyond what the state statute required, the ADOC provided a service subject to the requirements of the ADA and imposed upon itself a duty to ensure that all inmates were able to meaningfully access benefits tied to that service.

But even where Reeves adequately defines the form's benefits, he must also demonstrate that he lacked meaningful access to those benefits.  To do so, Reeves relies on Dr. Fahey's testimony to show that his cognitive disability rendered him unable to understand the election form.  Dr. Fahey evaluated the readability of the form at an 11th grade level (Doc. 78 at 33–34) and testified that Reeves's "severe" language disorder prevented him from comprehending the form's language (*Id.* at 39).  She also determined Reeves's literacy abilities to fall between the 1st and 4th grade levels. (*Id.*)  Other experts have evaluated Reeves's reading ability as high as 5th grade level.  No matter his true ability, all evaluations fall far below the 11th grade readability level Dr. Fahey determined the form to require.  And this evidence is largely unrebutted—the ADOC denies that the form's required reading level was that high, but it produced no actual evidence to contradict Dr. Fahey's findings.[13]

---

[13] The ADOC produced no evidence that the form read at any level below the 11th grade level other than ADOC counsel's aforementioned assertion that her own testing revealed the form read at a 10th grade level.

Despite Reeves's inability to comprehend the election form, the ADOC notes that the record contains support for the proposition that Reeves did receive information about the form sufficient to satisfy the ADOC's obligation to provide him meaningful access.  When he distributed the election forms, Captain Emberton says that he explained the form's purpose and notified the inmates that because the law had changed, they now had a new choice of execution method. (Doc. 42-4 at 148.)

Although the ADOC argues that Emberton's explanation made clear what the form was for and how it was to be utilized, there is no evidence that Emberton's explanation was directed at or heard by Reeves. During the December 9, 2021 evidentiary hearing, Emberton testified that he announced the form's purpose to groups of inmates on "each tier" of the death row housing area, not to each inmate individually.  In fact, when deposed, he testified that if an inmate was not present during the form's distribution, that inmate would not have received a copy or heard his explanation. (Doc. 78 at 189.)  Or if an inmate was sleeping, Emberton says he simply slipped the form through the bars of the cell, knocked the bars, and told the inmate he had something to fill out. (Doc. 42-4 at 151.)  Contrary to the ADOC's suggestion, this is not the sort of "explanation" that would have provided *meaningful* access to the form's benefits.

What's more, Reeves stated in his sworn declaration that it was not actually Emberton who gave him the election form, but rather a "hall runner," and that he never spoke to Emberton about the form or the new law. (Doc. 27-14.)  Instead, Reeves avers, had he understood the form's language, he would have signed and timely submitted it in June 2018. (*Id.*)

Although true that Reeves was not entitled to a more comprehensive explanation of the form's legal or factual implications than his fellow inmates received, *see A.M. ex rel. J.M.*, 840 F. Supp. 2d at 680 ("'Meaningful access' . . . does not mean . . . preferential treatment."), he was entitled to a basic understanding of the form such that he could actually utilize it and meaningfully access its benefits. Regardless of the efficacy of Emberton's "explanation," and whether or not Reeves even heard it, an inmate who could read and comprehend the election form would have been able to utilize and benefit from the form.  But Reeves, because of his disability, avers that he did not have even a rudimentary understanding of the form's language or its purpose.  As a result, it appears likely Reeves could prove that he lacked meaningful access to the form's benefits of notice, ease and ability of election, and reservation of rights.

### c.  Failure to Provide Reasonable Accommodation

Having found that Reeves is likely to succeed in showing that he was denied meaningful access to the election form's benefits, Reeves must now establish that

he was denied a reasonable accommodation as required by the ADA.  If Reeves's disability prevented him from receiving the form's benefits, the ADOC is required to "provide reasonable accommodations to ensure that [he] is permitted access to the same benefits and services as others." *Arenas v. Ga. Dep't of Corr.*, Case No. CV416-320, 2020 WL 1849362, at *11 (S.D. Ga. Apr. 13, 2020).  However, no duty to provide such accommodations is triggered before a claimant makes a specific demand for one. *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir. 1999).  The claimant himself must explain what it is that he requires— public entities are not required to "guess at what accommodation they should provide." *Randolph v. Rodgers*, 170 F.3d 850, 858 (8th Cir. 1999); *see also Hedberg v. Ind. Bell Tel. Co.*, 47 F.3d 928, 934 (7th Cir. 1995) (noting the "ADA does not require clairvoyance").

It is undisputed that Reeves did not make any such request of the ADOC. (Doc. 27 at 18, 19.)  Absent a request, Reeves can only succeed if his disability, limitations, and need for an accommodation were "open, obvious, and apparent." *Arenas*, 2020 WL 1849362, at *12; *see also Nattiel v. Fla. Dep't of Corr.*, 2017 WL 5774143, at *1 (N.D. Fla. Nov. 28, 2017) (explaining a plaintiff does not have to request an accommodation if "the defendant otherwise had knowledge of an individual's disability and needs but took no action").

Reeves argues that the ADOC could have accommodated his disability by, among other things, reading the form to him, giving him more time to understand it, performing a comprehension check, or using assistive technology. (Doc. 21 at 7.) But because Reeves did not request an accommodation, his need for one must have been obvious to the ADOC.  Reeves is likely to successfully demonstrate that it was.

Reeves builds his argument on three key assertions: (1) the ADOC was on notice that Reeves was cognitively disabled and struggled to read based on numerous records in his prison file, dating back to his first week in custody (Doc. 27 at 10, 21), (2) Reeves had made a prior request for reading assistance (Doc. 27-1), and (3) the ADOC was on notice of his low IQ scores and inability to read because one of the defendants here, Commissioner Jefferson Dunn, was the defendant in Reeves's federal habeas litigation. *See Reeves,* 2019 WL 12469769 at *1.

The ADOC attempts to rebut these assertions by pointing to Reeves's inmate record and his behavior while incarcerated to show that Reeves knew how to read, write, and effectively communicate.  The ADOC notes that for years, its staff evaluated Reeves's intellectual functioning, memory, speech, and concentration as "normal" and "good," and his behavior as "rational." (Doc. 42 at 35; Doc. 42-5 at 111, 112, 122.)  The ADOC argues the record also proves Reeves's history of understanding and completing forms and other paperwork.  During his time at Holman, Reeves signed numerous forms, many containing legal jargon and

complicated medical terminology (*id.* at 36; Doc. 42-5 at 7, 10),[14] and filled out numerous medical request forms (Doc. 42-5 at 27, 49, 71, 80, 85, 193, 226).[15] Completing and signing these forms, the ADOC argues, could not have given ADOC staff the impression that Reeves could not read, write, or communicate his needs. (Doc. 42 at 38–39.)

To further support its position, the ADOC presented testimony at the December 9, 2021 evidentiary hearing from several of its non-medical staff members who stated they had no reason to believe Reeves suffered from a cognitive disability. Captain Emberton, Deputy Commissioner Cheryl Price, Holman ADA Coordinator Richard Lewis, and Correctional Officer Issac Moody each testified that there was no indication that Reeves struggled to read things, that he spoke and communicated clearly, and that he had never requested help with understanding a document. (Doc. 78 at 84, 98, 121, 138–39, 178–79.)  They further testified that if Reeves needed an

---

[14] Worth noting is that many of these forms also include notations that the document was reviewed with the patient (Doc. 42-5 at 40, 42, 87) or that the inmate confirms he had been "fully informed" about what he was signing (*E.g., Id.* at 132).  Still others include notations that Reeves refused to sign the form (Doc. 42-6 at 64, 65, 87, 90, 98, 99, 100, 110), or the form had no signature (*Id.* at 86, 88, 89, 91, 92, 101) or was filled out by another person and signed by Reeves (*Id.* at 97, 102, 107, 138, 139, 140, 149, 150).

[15] Although the ADOC cites to dozens of forms it purports were filled out by Reeves, there is a question as to whether all of these forms were written by Reeves himself.  The parties agree that the 2015 inmate request slip (Doc. 27-1) was drafted by Reeves. When comparing numerous other request forms with the handwriting on the inmate request slip, it appears that Reeves may not have been the one who drafted those forms. (*Compare* Doc. 42-5 at 14, 15, 16, 29, 31, 38, 52, 97, 129 *with* Doc. 42-5 at 27, 49, 50, 71, 180, 185, 193, 226.)  Reeves having another inmate fill out prison forms on his behalf is consistent with testimony from Captain Emberton in the *Smith* litigation that death row inmates often "help each other out" because they see it as "demeaning and degrading" to ask staff for help. (Doc. 42-4 at 133.)  Neither party has made an argument or presented evidence that these forms were or were not drafted by Reeves, but with the benefit of additional discovery, some light could be shed on this observed discrepancy.

accommodation, he could have found information on how to request one in the prison's ADA Handbook; a copy of which was kept in the prison library and was also available online. (Doc. 78 at 123, 179.)[16]

Although records in Reeves's inmate file do indeed show that he was routinely evaluated as normal, Reeves points to numerous other documents in his file as evidence that ADOC staff had repeated concerns about his mental health,[17] intellectual abilities, and literacy, dating back to his first days in custody and continuing throughout his incarceration. For example, in July 1998, during a mental health intake screening, ADOC staff commented that Reeves had "poor communication," was "fragile and easily confused," had "trouble processing information," and "may have limited intel[ectual] abilities." (Doc. 42-1 at 126.) Following Reeves's placement in segregation later that year, a mental health review form evaluates Reeves's intellectual functioning as "slow" and indicates that Reeves "possibly cannot read." (Doc. 27-37.) The next year, in March 1999, following an inmate interview, ADOC staff noted that Reeves suffered from "mild retardation" and was a "special education prospect." (Doc. 27-36.) Later in 1999, following a

---

[16] This testimony fails to recognize that if Reeves struggles to read, he could not have read and understood this handbook in order to educate himself on how to properly request assistance.

[17] Reeves's inmate file includes numerous records documenting his mental health struggles while incarcerated. Various records indicate Reeves suffers from a mood disorder (Doc. 42-1 at 241, 244, 245), hears voices (*Id*. at 231), was placed on suicide watch (*Id*. at 227), "remains psychotic" (*Id*. at 242), and once set fire to his cell, burning himself in the process (Doc. 42-5 at 38). Although Reeves refers to his mental health issues in support of his ADA claim, the evidence he has presented appears to focus on his cognitive disability and reading difficulties.

psychological interview, an ADOC counselor listed recommendations for Reeves that included "reading" and "special education" and remarked that Reeves reads at "probably 4th - 5th grade level." (Doc. 42-6 at 178.)  And in 2003, on a mental health referral form, ADOC staff noted that Reeves had a "learning disability." (Doc. 27-37 at 1.)

The most informative record that his disability was obvious, Reeves asserts, is an inmate request slip he submitted in 2015.  On this form, Reeves wrote "I would like to have those papers to sign.  I did not know what they were and wanted to have it read to me but Sgt. said he did not have time.  So will you bring the papers back to me?" (Doc. 27-2.)  This document, Reeves argues, proves that not only had he previously requested a reading accommodation, but that his request was denied. (Doc. 27 at 21–22.)  However, the ADOC disagrees, arguing that "a single document indicating that Reeves once asked a single ADOC employee to read a document to him . . . does not indicate any likelihood of establishing an 'obvious' need for accommodation . . . ." (Doc. 42 at 38 n. 177.)

To bolster this contention, the ADOC relies on Holman ADA Coordinator Lewis's testimony regarding this request slip.  At the December 9, 2021 evidentiary hearing, Lewis testified that he would not consider this document a formal request

because it was not written on an actual accommodation form.[18] (Doc. 78 at 118.) But when asked to identify what request was written in the form, Lewis confirmed that Reeves was "making a statement saying that an officer did not accommodate a request he asked of him." (*Id.* at 121.)   Lewis then testified, had a request like Reeves's been brought to his attention, he would have gone to speak with the inmate to "see what does he need" (*Id.* at 119) and agreed that if an inmate said he could not read a document, Lewis would have found a way to assist him. (*Id.*)   At the conclusion of his testimony, when asked by the Court if "that exact same language was put by Mr. Reeves on a form that said 'ADA request form,' would you have treated that as an accommodation request," Lewis answered "yes." (*Id.* at 126.)

The Court agrees that this inmate request slip does not make a formal request for an ADA accommodation.   But importantly, this form memorializes Reeves's verbal request for a reading accommodation which ADOC staff either ignored or denied.   This request slip, along with numerous other ADOC records in which staff express concerns regarding Reeves's ability to read and his intellectual functioning, support Reeves's contention that the ADOC should have known Reeves required a reasonable accommodation to utilize the election form "had they just looked." (Doc. 27 at 20.)

---

[18] Reeves's inmate request form was submitted in 2015. Holman's ADA program, and the forms to request an accommodation, were not implemented until 2016. (Doc. 78 at 157.)   Therefore, Reeves's 2015 request to have documents read to him could not have been on an official ADA accommodation request form.

What's more, Reeves asserts, is that in the months preceding the election form's distribution, the ADOC was aware of his low IQ scores and inability to read because ADOC Commissioner Dunn was the defendant in Reeves's federal habeas litigation.[19]   During this litigation, Reeves asserted an *Atkins* claim and was evaluated by Dr. Goff and Dr. King, both of whom found Reeves had impaired intellectual functioning and limited reading abilities.  The ADOC was clearly aware of these findings because Commissioner Dunn cited to them in his April 2018 response to Reeves's habeas petition. *Reeves v. Dunn,* Case No. 1:17-cv-00061-KD-MU, Doc. 25 (S.D. Ala. Apr. 4, 2018).  Specifically, this response cites to the results of Reeves's neurological testing, including Dr. Goff's finding that Reeves was "functionally illiterate," had an IQ of 71, and could read at only a 3rd grade level. *Id.*  The brief also highlighted Dr. King's determination that Reeves could read at only a 5th grade level, had an IQ of 68, and fell within the borderline range of intellectual functioning. *Id.*  Dunn likewise cited to the state circuit court's finding that Reeves's intellectual functioning was "subaverage." *Id.*  Although this evidence was insufficient to support Reeves's *Atkins* claim, in the present case, under the ADA, it demonstrates that the ADOC was on notice that Reeves had IQ scores in the high 60s or low 70s, subaverage intellectual functioning, and had been found to be

---

[19] Evidence submitted during Reeves's habeas litigation also included his primary school records, which show that Reeves repeated the 1st, 4th, and 5th grades and was placed into special education classes. Although the ADOC argues that Reeves's academic problems were due to behavioral issues, not disability, no evidence has been presented as to whether or not these childhood behavioral struggles were the result of Reeves's subaverage intellectual functioning.

functionally illiterate *a mere two months* before it handed him the election form and expected him to comprehend and utilize it without accommodation.

All told, ADOC records reflect repeated concerns regarding Reeves's cognitive abilities and literacy in 1998, 1999, and 2003.  In 2015, Reeves asked prison staff for assistance reading documents, a request that Holman's ADA Coordinator would today consider a request for an accommodation.  And in 2018, Commissioner Dunn filed a brief acknowledging Reeves's low IQ scores and functional illiteracy. Weighing all of this evidence against the documents and testimony cited by the ADOC, the Court finds that Reeves is likely to succeed in proving his need for an accommodation was open and obvious to the ADOC.

*2.  Equitable Factors*

The remaining considerations in deciding whether to grant a preliminary injunction involve the equities.  This Court must (1) weigh whether the moving party will suffer irreparable harm without the injunction, in addition to (2) "assessing the harm to the opposing party," and (3) "weighing the public interest." *Nken*, 556 U.S. at 435.  The last two factors "merge when the [State] is the opposing party." *Id.* "[E]quity must be sensitive to the [State's] strong interest in enforcing its criminal judgments without undue interference from the federal courts." *Hill v. McDonough*, 547 U.S. 573, 584 (2006).

Without an injunction, in less than three weeks, Reeves would face execution by lethal injection, a method he expects would be "torturous." (Doc. 27 at 23.) Reeves avers that absent the alleged ADA violation at issue here, he would have instead chosen his death be by nitrogen hypoxia.  He urges that his execution by lethal injection would prematurely moot his ADA claim before it can be decided on the merits, a harm Reeves contends is "real and irreparable." (*Id.*)

Reeves further argues that an injunction will not harm the opposing party because the ADOC has represented, on multiple occasions, that it is in the final days of developing a protocol for nitrogen hypoxia executions. (Doc. 27 at 25.)  Reeves notes that should the ADOC finalize a constitutionally acceptable protocol, it can execute him by nitrogen hypoxia.  If the ADOC fails to do so, Reeves's claim can instead be resolved at trial.  Either way, Reeves points out, any injunction issued by this Court would eventually be dissolved, Reeves would be executed, and the ADOC would not be harmed. (*Id.*)

In response, the ADOC counters that lethal injection is a constitutional method of execution, and therefore what Reeves claims would be an irreparable injury is merely his lawful execution. (Doc. 42 at 40.)  The ADOC further notes that Reeves has been on death row for over twenty-five years (*Id.* at 42) and argues that a preliminary injunction would harm the public interest because "[b]oth the State

and the victims of crime have an important interest in the timely enforcement of a sentence." (*Id*. at 41).

On balance, the equities favor Reeves.  Although an injunction that further delays his execution "impose[s] a cost on the State and the family and friends of the murder victim," *Bowles v. DeSantis*, 934 F.3d 1230, 1248 (11th Cir. 2019), counsel for the ADOC represented to this Court that a final nitrogen hypoxia protocol is only weeks away. (Doc. 78 at 219.)  Balancing this arguably short delay against the irreparable harm to Reeves if he is forced to face execution by a method he so greatly fears—and one he would not have chosen absent the ADOC's alleged ADA violation—the equitable scales tip in favor of Reeves.

After all, Reeves is correct that the "public has an interest in persons aggrieved by ADA violations receiving judicial review." (Doc. 27 at 26.)  Congress enacted the ADA to, among other things, "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(6)(1).  If it did violate the ADA, the ADOC has no interest in conducting an execution that contravenes the statute's intent to protect individuals with disabilities.

Reeves has shown a substantial likelihood of success on the merits of his ADA claim and the equities weigh in his favor.  Reeves has therefore established his right to a preliminary injunction that prevents the ADOC from executing him by any

method other than nitrogen hypoxia before his ADA claim can be decided on its merits.

## V. CONCLUSION

For the foregoing reasons, it is ORDERED as follows:

1. The Motion for Preliminary Injunction (Doc. 27) is GRANTED; and

2. Defendants Jefferson Dunn and Terry Raybon are hereby ENJOINED from executing Matthew Reeves by any method other than nitrogen hypoxia until further order from this Court.

DONE on this the 7th day of January, 2022.

/s/ R. Austin Huffaker, Jr.
R. AUSTIN HUFFAKER, JR.
UNITED STATES DISTRICT JUDGE